Please, whenever you are ready, and please do tell us if you are reserving any time for rebuttal. And I promise to speak up for everyone, present and remote. Did you hear that, Mr. McHale? I've got it. OK. Good morning, Your Honors. May it please the court. My name is Sam Saylor. I am arguing on behalf of Mustafa Alowemer this morning. If I may, Your Honors, I'd like to reserve three minutes for rebuttal in this case. Please. Thank you. For the application of the terrorism enhancement, which massively increases an offense level in the criminal history category of defendant, the government must show that the defendant's offense was calculated to influence, affect, or retaliate against government conduct. That's straight from the enhancement, which makes reference to the statute. So we'll start on what both sides agree on here, which is that the word calculation from the statute, from 2332BG5, is equivalent to specific intent. So what did Mr. Alowemer specifically intend with his offense to happen? OK. And in situations of, we wouldn't exactly call it mixed motive, but mixed intents or combined intents, is it sufficient that one of the intents be to influence or retaliate? Your Honor, in that hypothetical, yes. OK. So you're just disagreeing about whether one of the intents here was to influence or retaliate? That's correct, Your Honor. I think the kind of massive enhancement here requires clear evidence of specific intent. OK. The Second Circuit has said it thought motive was irrelevant, but why wouldn't we, it's not a motive test, but why wouldn't motive bear on helping us to understand what one of the intents was? I think I would agree, Your Honor, that we can, you know, I think you're referring to the Awan case in the Second Circuit in which they essentially had this idea or hypothetical where there's a political assassin who's doing it for money but is aware of the consequences of his political assassination. You don't disagree with that? I don't disagree with that, Your Honor. OK. So here's the problem. You know, in the West, there's separation of church and state, and it is, of course, possible to have a religious animus without a political one. But ISIS doesn't respect the separation of church and state. It envisages a caliphate that serves political as well as religious goals. So if you support, you could just say we hate Christians, but if you say we support ISIS and ISIS's goals, well, ISIS's goals are both political and religious. Wouldn't that suffice then if you're trying to help ISIS or hurt ISIS's enemies? You're doing both. Yes, Your Honor. I would say that that essentially collapses the world view of ISIS with my client, Mr. Al Oweimer. OK. If Mr. Al Oweimer embraces ISIS's mission, that would be right.  Certainly, and I think there are some crucial differences between what ISIS wanted to achieve sort of globally and what Mr. Al Oweimer in this case did through his conduct regarding the church plot. Most notably, he does not wish to claim credit for ISIS, as the district court finds, and that's a pretty big difference and separates him from what ISIS global or ISIS leadership wants. I do think it's important to inquire as to what Mr. Al Oweimer intended with this church plot in particular versus all the other extraneous stuff going on in this case, you know, that happens over months of communications with undercover agents who are posing as ISIS members, who are posing as older brothers, who Mr. Al Oweimer says. He wanted to draw first responders, including Pittsburgh police, maybe firemen. He was talking about setting off a second bomb. Which he didn't do. Which he didn't do, but he was seriously contemplating that possibility and discussing it, so the Pittsburgh police and fire departments, et cetera, were part of that calculation. Your Honor, excuse me, respectfully, I would disagree that that is part of the conduct in this case. The offense conduct in this case is what he actually calculated the church plot to do. He actually disavowed the second bomb, as the district court found. He specifically targeted the church because they're Nigerians, and he didn't like what the Nigerian government was doing. I'm sorry. Why isn't that retaliation against Nigeria for its war against ISIS? Well, Your Honor, I think you're referring to the exchange, which is reproduced in the reply brief, page 17 and 18. I would say, to Your Honor, a few things. One is that the mention of the word revenge in thousands of pages of transcripts and months of communications is simply not enough to trigger the necessary mens rea in this case, this calculation, this specific intent. The government accuses me in my opening brief of basically isolating the enhancement in the statute language, but it's the government that's basically isolating these words revenge. He does give two justifications. Maybe the first one is they're polytheists, they're Christians, whatever the Arabic word is, but then he also says revenge. We tend to defer to a district court's, I mean, you make a case for de novo review here, but if we're all agreeing upon what the legal standard is, should we be reviewing de novo? Shouldn't we be deferring to the district court's weighing of whether this was one significant intent that he had? Well, I think the answer to your question actually ties in with the answer to my last question as well, or to your last question as well, which is, A, yes, there should be a de novo review standard. The district court articulates the language of the statute and the enhancement. However, misapplies that. But that seems to cut against the idea of de novo review. If it's mainly a legal disagreement about what counts as calculation, but you started your argument by basically agreeing with me about the articulation of the standard and the Second Circuit, this has all been a discussion about misapplication. That would seem to favor a deferential standard of review. Your Honor, I think whether my client specifically intended, or the actual definition of specific intent here is a legal determination that this court can make based on the facts that I'm presenting and the government is presenting. Again, I'm not disputing the facts that the district court found. I am disputing the fact that the district court found that the statements of sort of general anti-American frustration are sufficient to show this nexus between what my client specifically intended and the government conduct here. That nexus is what this court can find legally was not met by the government in this case. Does the nexus have to be a direct influence, or is an indirect influence or affecting of a government suffice? The statute says influence, affect, or retaliate against. I think that implies a pretty strong connection between government conduct in this case and specific intent. Why would the term government conduct be in the statute and by reference from the enhancement if Congress didn't mean for that to be an essential part of the calculation here? Yeah, but influence and affect are pretty broad words. Well, you know, again, I think I'm urging the court in this case to restrain the government from essentially what is an unlimited application. Any mention of the word revenge in thousands of pages is enough to trigger this intent requirement. Excuse me, I would respectfully disagree that that is the choice of Congress and the choice of the Sentencing Commission in these statutes and enhancements. There has to be some sort of restraint or some sort of limiting principle that would test this nexus. And here the government simply just doesn't meet that. Your Honor talked about this exchange in which he mentions the word revenge. Clearly the government in its sentencing presentation was concerned about this nexus between this revenge and the government conduct here. It, at the sentencing presentation, submitted screenshots from my client's phone that actually post-stated what my client is supposedly taking revenge for. Battles from Niger and Mali on June 8th, 9th, and 15th. How can my client take revenge for things that hasn't happened yet? All right, well, we also have the White House going up in flames. I mean, there's clearly a lot of anger at the U.S. government. Absolutely a lot of anger. The Nigerian government. That goes to, I'm sorry, Your Honor. Respectfully, that goes to what my client has already pled guilty to, the material support of ISIS underlying claim. It does not automatically trigger the enhancement. Again, if Congress and the Commission wanted to write it that way, they would have. And, in fact, in Application Note 4, which I pointed out in my brief, it actually contemplates when there are civilians or non-government conduct that is targeted here. It's not what Mr. Allewander would escape punishment or escape the accounting for the harms that goes on in this case. Except that runs right into the government's World Trade Center hypo, right? The World Trade Center wasn't targeted because there are government offices there. It's not a government building. If it had just been the World Trade Center and not the Pentagon or potentially the White House, I mean, your logic does seem to suggest that wouldn't qualify. Respectfully, Your Honor, I disagree. I think that's exactly what the calculation of the 9-11 bombers who ran into the World Trade Center calculated their offense here, the actual act to accomplish, which is to influence a factor of retaliation against government conduct. There's no doubt that in their minds and everyone else's minds, there is a direct link there. That nexus is clearly established before that act was accomplished. Here, that nexus is absolutely not met, except for a stray word of revenge. And I'm saying that's simply not enough to meet this or, I'm sorry, to trigger this massive enhancement. Your Honor, I would just also say that Mr. Allawaymer, in terms of the references to Nigeria, there are zero references to the Nigerian government or particular actions in which he's supposedly taking a revenge. It's all in response to a direct question by the undercover agent. What about this Nigerian church? Is the Nigerian government here even mentioned? No. It's all coming back to the religiosity and the piousness of Boko Haram, ISIS. Again, he's confused. He's aware there's a conflict in Africa, but is that enough to trigger this massive enhancement? I would submit to Your Honor that is not enough to establish this nexus between the specific intent and the government conduct. If he's doing this to try to help Boko Haram or ISIS, that's not enough? Well, A, he's confused whether Boko Haram and ISIS are even in league with each other at that moment. And no, I would say that, again, this solitary reference there is not enough to trigger this huge enhancement. And when I detail in my brief, there are many other examples of a clear intent here or what he calculated his offense to accomplish in terms of the religiosity. He's going to bomb a mosque. He has his nashid, which is a poem bragging about his disdain for other Muslims here. It all focuses on the religiosity of his opponents in the government. We'll hear the rest of yours on the rebuttal. Thank you, Your Honor. Mr. McHale, whenever you're ready. Thank you. Good morning, Your Honor. As you may please the court, Matthew McHale on behalf of the United States. This court should affirm here because there was no clear error or any error in the district court's application of terrorism enhancement. Here to an enthusiastic, self-motivated, long-time ISIS supporter who even admitted after he was arrested that he had been involved in, quote, what he was doing as something that he was doing to or against the United States. And I would like to start by just briefly referring to my opposing counsel's argument. And I understood him to concede in response to questioning that. If Mr. Alloy were embraced ISIS's mission, then in light of the. Collapsed, you know, distinctions in his view between religious and political goals, that that by itself could be sufficient to support the enhancement. And I think the record here clearly demonstrates that rallying or absolutely embraced ISIS's mission. And I think we agree, I mean, as as Mr. Saylor was saying, I think both sides agree that he here is really the factual determination. The district court made in terms of whether the defendant calculated that the defense here was calculated to influence, affect or retaliate against. On that, Mr. McHale, on that point, do you agree that the mens rea is specific intent rather than knowledge? We do agree, and that is one of the elements that separates that is a key element that ensures, contrary to what the other side has argued, that this analysis doesn't and the government's position here, the arguments it has made do not collapse. The in this case, material support offense and the elements to prove that offense, which are knowledge. Does not collapse those with the specific intent that is required to prove the sentencing enhancement. And here the evidence goes well, well beyond even a close case that would justify application of the enhancement. Mr. Alla Weemers references to Nigeria and his his words saying that he wanted to take revenge for our brothers in Nigeria was much more than just an isolated snippet that he said that, you know, my friend seems to be suggesting. Yes, he said that. He also had screenshots on his phone dating from June 15th, 2019. Which explicitly referred to conflict that was occurring in Nigeria between Nigerian forces and either Boko Haram or the Islamic State in West Africa. And I would also note that I disagree with my friend that Mr. Alla Weemers was confused about the distinction between Boko Haram and the Islamic State. I think he was actually accurately pointing out in the transcript from the conversation with the undercover employee that Boko Haram had at one point pledged feel deep to ISIS. And then there had been something of a falling out. Sort of a distinction without difference. There was also an Islamic State in West Africa province that sort of emerged after the fact. The point is that Mr. Alla Weemers was clearly aware of the conflict in Nigeria. He also had images on his phone that were seized after his arrest showing a black cloud sort of coming down from northern Nigeria that represented the region that was at the time most closely affiliated with the Islamic State in that area. So there's multiple pieces of evidence here that shows his intent and calculation to retaliate against that government conduct. Mr. McHale, is it your view that the district court was able to aggregate Mr. Alla Weemers' calculations regarding various governments? Governments of the United States at various levels, Nigeria or other countries to cumulatively establish the requirements of the statute? Yes, I do. Because the district court properly looked at the entire sort of time here and the plot and the different steps that Mr. Alla Weemers took along this plot. Including the fact that, by the way, I disagree. I believe my friend said that the selection of the Legacy International Worship Center here was something that was suggested by an undercover agent. I don't believe that's accurate. Mr. Alla Weemers was the driving force behind this plan. And in response to Your Honor's question, it's absolutely appropriate to consider the fact that this was a longtime supporter of ISIS. The evidence of his enthusiasm goes back years, including back to even before he came to the United States. All right. But your friend on the other side argues with some force, sure, ISIS does these things, but his particular interest seems to be in just opposing the heathen, the polytheists. So can't you support part of ISIS's mission without necessarily supporting the anti-government part of it? I don't think you can, certainly not on this record, Your Honor. But Your Honor, even hypothetically, I'm not sure how you could do that. It might be a different question if you had a defendant who was, I guess, purely motivated by religion. I'm not sure what that would look like. I find that implausible as a hypothetical. But in this case, you also have him going, Mr. Alla Weemers, going through, you know, again, he knows in the spring of 2019, ISIS has suffered a major setback in the Battle of Baghouz, which was sort of its last, you know, foothold in Syria. He's looking for a way to avenge that setback in particular. And we know, again, from his own words, that he considered, for example, attacking, killing a member of the U.S. military. And his reason for doing that was because he killed our sisters in Baghouz in Iraq. So you have that incident. You also have him somewhat chillingly offering up apparently schoolmates of his who were members of the Kurdish Yazidi minority, again, connected to this Battle of El Baghouz. So what you have here is a defendant, an ISIS supporter who is, you know. But the Yazidis are not a government. So opposing them or taking revenge on them is not going to qualify. Well, I would just, I mean, it's true they are an ethnic minority, but they were part of the U.S.-led coalition, 85-nation coalition that he was aware of, Mr. Alla Weemers aware of. And the conflict that the Kurdish forces were engaging in in Baghouz was, I would suggest, and I believe the district court agrees with this, is governmental action. I mean, it was a war. It was a fight. So the personnel involved in that fight happened to be Yazidi. And I think that his own words make it clear that his, part of his calculation, which he ultimately apparently discarded, but was to revenge, get revenge against the Yazidis because of the governmental conduct, namely the Battle of El Baghouz. I mean, he refers to that battle multiple times and frequently. Mr. McHale, when we're looking for Mr. Alla Weemers' intent with regard to this specific conduct leading to the conviction, are there any outer bounds to what we can consider? You know, we have years of evidence from his phone and social media and whatnot that shows maybe some insight into his thinking long before he even contemplated committing this offense. So how much of that can we consider? Your Honor, I would not, I mean, I don't see any basis to put, for example, temporal limitations on what kind of evidence could be considered. You know, here, I would say, first of all, you know, the bulk of the evidence here comes from just a matter of short months ahead of time. But I don't see any reason why, unless the defendant is going to argue, you know, it has the basis to argue that there has been some kind of disavowal or, yeah, disavowal or abandonment of support for a terrorist organization like ISIS. I think it's completely fair game to consider the fact that his enthusiasm for the group dates back to 2015. Because I think, and it's legitimate to do that, and I think it shows that this was not some kind of, you know, last-minute spur-of-the-moment thing. You know, again, contrary to, I think, what the other side has suggested in their briefs here, you know, this plot was the result of hours and hours and hours of time that Mr. Alleweyner put into choosing targets, discarding targets, and ultimately settling on this church. Which I would also note, too, you know, he knew this place because he lived close by at one point. And I would also note that, you know, again, supporting the fact that this was not just kind of a random sort of idea that he had, he argues at a couple points that this place was deserted and the neighborhood was deserted. He claimed after he'd been arrested, and he also said a number of other false things that were sort of exculpatory. But again, he grew up near this, he lived for a time near this building. And the evidence of the record from the FBI special agent, which on page three of Mr. Alleweyner's reply brief, he does not challenge the veracity of, that testimony established that there were people living immediately next to this church. Let me ask about a specific piece of evidence. I imagine that from your perspective, one of the more helpful ones is at one of their meetings when they actually went to visit the site, Mr. Alleweyner suggested they plant an ISIS flag with the message, we have arrived, but then decided against it. So I don't know if that, do you consider that relevant? Can we consider that, even though he pulled back from the suggestion? I think you can consider it, Your Honor, and the district court appropriately did, because similar to what I was asking about before about other elements that he may have altered or decided, or at the moment that he was arrested, maybe decided not to go for, for example, the second bomb that he had considered. I mean, I believe that does go to what he was calculating and what the overall sort of intent of the plot was. And I would also note that it's one of the factors that absolutely makes that relevant is that he also expressed multiple times a very attentive attention to being caught and not wanting to get caught. He said that in his own words multiple times about, you know, the important thing is to stay quiet on social media. And that was because he also expressed the desire and the plan to continue on after this. What's the relevance of the, of the thinking about shooting some of the, some of the soldiers or reservists who enrolled with him? Your briefing doesn't really do anything with that. Is it, does it come too late to be considered? No, I don't, I don't think so, Your Honor. I mean, he, you know, some of the, I mean, he expressed ideas and was thinking about attacking either, yeah, either a member of the U.S. military that may have seen in the forest, I believe he says. And then also he talks about how perhaps next year after he graduates from high school and attends college, he seems to be thinking that there are some ROTC students that he may be able to attack there. I don't think that comes too late. I mean, that all comes in the process of planning and leading up to the selection of this church. And I think what it shows, and this shows multiple times, similar to the Yazidis and other ideas he has is he is determined to, with his, with his desire to undertake Nafir being frustrated for the moment, that is to travel overseas to die a martyr, that seems to be frustrated. He's following the advice from al-Baghdadi, the ISIS leader at the time, to attack at home. And what it shows, what those plans show and other similar plans is that he is, he sees ISIS's defeats or other conflicts it's having overseas, and it shows his determination and his calculation and intent to strike a blow in ISIS's name at home, which is, which was consistent with the explicit guidance, again, that he was aware of and had heard from, you know, from ISIS directly. And evidence of that is in the record. So I think that's all relevant to show the intent here. I would note that, again, we, sorry, I'm just checking my timer, we would agree, I think it seems to be agreed that the clear error standard is appropriate here, following the, among other cases, the Rodriguez decision last year that Judge Porter authored. And I think that's because what this case is really about is just the factual determination that the district court made that, you know, of his intent. It clearly shows that he was, you know, the offense was calculated to influence, affect, or retaliate against government conduct. I can briefly address the sort of second part of the argument that Mr. Allalinger makes about whether the court erred in allegedly failing to consider the sort of evidence of psychological. You're out of time. Unless Mr. Saylor gets into that, I think we'll take that one on the briefs. If the court has any further questions, thank you. We would ask that the court affirm. All right. Thank you, Mr. McHale. Mr. Saylor, you have three minutes for rebuttal. Thank you again, Your Honors. The government articulates a principle that I believe Your Honors can see that is essentially unlimited. It's unlimited in time, as Your Honors' question alluded to. No time limitations as to what our viewing court can consider. Unlimited in terms of the comments to an undercover agent as to what this court can consider. Any word of support or magic words of revenge automatically, under the government's view, triggers this massive, massive enhancement. And that just simply cannot be true. There has to be some limiting principle here. And the government can't articulate one. Okay. What if instead he had targeted a gay nightclub, saying he's disgusted, revolted, et cetera, and that his understanding of his religion was that this was good at targeting decadent Westerners or something? How would that be reached by the government's theory? Your Honor, if there can be some sort of nexus, again, between the specific intent and what the person in your hypothetical calculated that offense to accomplish and the government conduct at issue, then the enhancement could be triggered. What government conduct would there be if, like, maybe he wants to make gay people scared or frightened or kill them or drive them underground or whatever? But where's the government conduct in a situation like that? Well, Your Honor, I think I can analogize this to the Tenth Circuit opinion in Stein, in which they analyze this and say, look, there's a clear link here between the attacks that are planned and government conduct or government policy. There's a manifesto in that case that's to be contemporaneously released with the attacks that's directed towards the Obama administration's administration of border policy and asylum policy. So that's a clear link there. If in your hypothetical there's some sort of articulation between that link of the government's toleration. What I'm saying is you said it's limitless. It would apply in every situation. And I think I've just given you a hypo where there's just no government conduct connection. You could be materially supporting a terrorist group, but the terrorist group could be targeting a sexual or religious or ethnic minority and not qualify for this enhancement. Then, yes, I think it would not qualify for the enhancement. However, it doesn't mean that this person would escape any sort of punishment or accountability for that harm because under Application Note 4 there is the provision of the upward departure. In that case, a defendant would certainly qualify for that upward departure, as does Mr. Allawaymer, by the way. I have no argument about that. But the enhancement is not just automatically triggered. The evidence that my colleague references about the terrorist things, about supporting ISIS for months, that all goes to his material support, the underlying guilty plea. Let me ask you the same question I asked Mr. McHale about his suggestion that they plant the ISIS flag and we have arrived, that that's what would be found after the bombing. Why isn't that good insight into what he was thinking? Well, I think it's insight into what he was thinking. His disavowal of that and his withdrawal of that is also insight into what he was thinking. Is it disavowal or is it just thinking better? Maybe it would be we don't want to get caught. Maybe we just, as a tactical matter, we shouldn't do that after all. Not that I'm disavowing the message of ISIS and the importance of planting its flag and so on, but just no, I don't think we should do that after all. And I think we should trust the government's own expert at the sentencing hearing, which said that claiming credit for ISIS, for these attacks, is an important part of the ISIS strategy. So this is a big break that Mr. Alawamer has with sort of ISIS global or ISIS leadership. According to the government's own expert, there's a big difference there. So I do think that's actually important to figure in this determination of what he calculated here. So I think that's very relevant about what he calculated disoffense in the planning of this church plot itself. Rather than the extraneous pieces of evidence regarding this soldier, which may or may not have existed, by the way, there are other pieces of evidence that my colleague mentions in terms of these other, excuse me. Thank you, Mr. Saylor. We'll ask that you prepare a transcript and that the government pick up the cost. And if we may, we'd like to greet counsel at sidebar to thank you for being here. I'm sorry we can't shake your hand, Mr. McHale. Zoom is not that sophisticated yet. So off the record for a moment, please. Thank you, Your Honors.